In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4309

Kevin Dvorak,

Plaintiff-Appellant,

v.

Mostardi Platt Associates, Inc.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 8461--Paul E. Plunkett, Judge.

Argued September 19, 2001--Decided May 10, 2002


   Before Easterbrook, Diane P. Wood, and
Williams, Circuit Judges.

   Diane P. Wood, Circuit Judge.  Kevin
Dvorak was employed by Mostardi Platt
Associates, Inc. (Mostardi-Platt) from
1989 until the spring of 1997. Throughout
those years, he suffered from arthritis.
Dvorak's arthritic pains would come in
flare-ups; there were periods during
which he was able to function quite well,
and other times when his mobility was
significantly restricted. In 1997, during
one of the flare-ups, Dvorak missed work
for a substantial number of days. Shortly
thereafter, he was terminated. Believing
that he lost his job because of his
physical disability, he filed suit
against Mostardi-Platt, alleging that he
had been terminated in violation of the
Americans with Disabilities Act (ADA), 42
U.S.C. sec. 12101 et seq. The district
court entered summary judgment in favor
of Mostardi-Platt. Although it found that
Dvorak was an individual with a
disability as defined by 42 U.S.C. sec.
12102(2) and that genuine issues of fact
existed as to whether he was qualified to
perform his job with or without a
reasonable accommodation, it concluded
that he was terminated for reasons
unrelated to his disability, and
therefore had no claim under the ADA. We
affirm.

I

Mostardi-Platt is a company that provides professional environmental consulting, compliance, and testing services. Initially hired as one of its technicians, Dvorak eventually became a Service Manager in the Clean Emissions Monitoring department (referred to as the CEM Services Group). In this position, he performed administrative work and was occasionally required to conduct field work, such as on-site visits to clients and supervision of the monitoring being performed at various facilities. (Dvorak disputes the prominence of field work among his duties, but the percentage of time he devoted to it, as opposed to the fact that field work was one component of the job, is not important.) In 1996 and 1997, Dvorak experienced health problems in connection with his arthritis that led him to take a large number of days off from work. By March 1997, he had run out of sick leave days and had to take two weeks of vacation time to undergo arthroscopic surgery on his knee. This was unusual: the last time his arthritis had affected him so strongly had been 15 years earlier.

When he returned to work after the surgery, Dvorak's supervisor, Joseph Macak, asked him to go to Peoria the fol lowing week for a field assignment. Dvorak refused, citing his arthritis and the fact that he would still be on crutches from the operation at that time, and relying on a doctor's note following the operation that effectively confined him to desk work. Dvorak also informed Macak that the doctor had concluded that Dvorak had a particularly severe form of arthritis called ankylosing spondylitis (AS). It is unclear-- though irrelevant for present purposes--whether any doctor ever so concluded. Although Dvorak was never ultimately diagnosed with this ailment, as opposed to a less severe form of spondyloarthopathy, we mention his allegation only in the interest of presenting the facts in the light mostfavorable to him.

In early March 1997, before Dvorak took his leave for the operation, Macak asked him to prepare a memorandum outlining his views on how to improve results in the CEM Services Group. This request reflected concerns about the productivity

of that Group on the part of both Robert J. Platt, the company's president and sole shareholder, and Macak. Dvorak turned in the requested memorandum on April 1, 1997. It was not what Macak expected. The memorandum itself is in the record, and its tone is hardly constructive. Among other things, Dvorak wrote:

I want to start out be [sic] reiterating my definition of insanity. Insanity is doing the same thing you have always done and expecting things to change! Mostardi Platt has developed a new definition. Mostardi Platt is doing less today then [sic] it has ever done and is expecting things to change. On the top of everything else every time we turn around we are burdened with tasks that make us less efficient.

In short, the memorandum read more like a tirade against the company than like a constructive proposal for improving work unit performance.

Company management met shortly after Dvorak delivered the memorandum to consider the situation as a whole: his disability, his performance, and his attitude. They decided it would be best for Dvorak to be placed on temporary med ical leave under the Family and Medical Leave Act (FMLA) program. On April 3, 1997, Dvorak was summoned to a meeting with management to discuss, among other things, the option of FMLA leave. Dvorak resisted the idea, claiming that he could do his job and thus that medical leave was not appropriate. Just the previous day, however, he had written Macak stating that he "may never be able to do the same kind of physical work" that he had "been able to do in the past." At the end of the meeting, it became clear that the leave arrangement was not optional. Platt, Macak, and a third company official told Dvorak that he had to leave the building that very day. Macak accompanied him as he packed up his personal belongings from his office and departed. Although Dvorak characterizes this event as his termination, he admits that it was not the last of his dealings with Mostardi-Platt.

After his departure, the company sent him documents to aid him in his application for FMLA leave. Initially, he

took steps toward completing the required forms. While Dvorak was in the process of applying for medical leave, Mostardi-Platt discovered that a laptop Dvorak had used had been tampered with, that a customer database had been improperly saved on its hard drive, and that the computer had been used for personal purposes, including the sending of communications to a competitor that were derogatory of Mostardi-Platt. The company made efforts to discuss the matter with Dvorak, but Dvorak was uncooperative. He refused even to meet to discuss the alleged misuse of the laptop. Dvorak continued, however, to communicate in writing with the company. On April 28, 1997, he wrote to Susan Oswalt, Mostardi-Platt's Director of Human Resources, asking "Sue, haven't you really terminated my employment?" He asked to be informed of his status at the company by May 9, 1997. As of April 24, and thus by the time of the April 28 letter, Dvorak's doctor had released him from the desk-only restriction. He never mentioned this to anyone at Mostardi-Platt; thus, the company had no reason to believe that Dvorak could once again perform field work. All it had was an earlier e-mail he had sent to Macak telling the latter that he did not know when, if ever, he would be back in shape.

On May 6, 1997, Oswalt wrote Dvorak and asked for a satisfactory explanation for the alleged computer misuse. Dvorak never responded. A further letter from Mostardi-Platt's counsel, dated May 21, 1997, expressed once again a willingness to meet and discuss the issues that had arisen with respect to Dvorak's employability. Again, Dvorak was not forthcoming, and no such meeting ever took place.

On May 28, 1997, Mostardi-Platt notified Dvorak by letter of his termination. The letter specifically referred to the damage that Dvorak's misuse had caused to the laptop, and further stated that the inflammatory April 1 memorandum "completely undermines our confidence and trust in you."

II

Even though some of the facts are in dispute, we conclude that they are not the critical ones. Naturally, as Dvorak's

claim was dismissed on summary judgment, we review the district court's determinations de novo and draw all reasonable factual inferences in Dvorak's favor. Lalvani v. Cook County, 269 F.3d 785, 789 (7th Cir. 2001).

Dvorak alleged in his complaint that he was terminated in violation of the ADA. While his firing did occur in close temporal proximity to his operation and the latest flare-up of his arthritis, we agree with the district court's conclusion that Dvorak cannot prove a case of disability discrimination. To establish a prima facie case of discrimination, a plaintiff must show that (1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of her job either with or without reasonable accommodation, and (3) she has suffered from an adverse employment decision because of her disability. Bekker v. Humana Health Plan, Inc., 229 F.3d 662, 669-70 (7th Cir. 2000). The district court found that Dvorak had put enough in the record to survive summary judgment on the first two critera: the severity of his arthritis for purposes of proving a disability, and his ability to perform the functions of his job. He faltered on the most fundamental showing--that the decision to terminate his employment was discriminatory-- whether one characterizes that as a failure to show that his adverse employment action was because of his disability, or as an inability to show that Mostardi-Platt's stated reasons were pretextual.

While "it is not always necessary to march through" the entire process of establishing a prima facie case, articulating nondiscriminatory reasons, and evaluating pretext, see Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 473 (7th Cir. 2002), we find it useful under the circumstances to review the various elements of the case that Dvorak would have had to satisfy to survive summary judgment.

Dvorak first had to show that he is disabled within the meaning of the ADA. The ADA's definition of disability encompasses a "physical or mental impairment that substantially limits one or more of the major life activities," "a record of such an impairment," or the

status of "being regarded as having such an impairment." 42 U.S.C. sec. 12102(2); 29 C.F.R. sec. 1630.2(g). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. sec. 1630.2(i). According to the Code of Federal Regulations, a person is "substantially limited" if, compared to the average person in the general population, she cannot perform or is limited in the manner in or extent to which she can perform one of the recognized activities. 29 C.F.R. sec. 1630.2(j)(ii); see also Emerson v. Northern States Power Co., 256 F.3d 506, 511 (7th Cir. 2001). As a general matter, arthritis has been recognized as a relevant impairment. Moore v. J.B. Hunt Transport, Inc., 221 F.3d 944 (7th Cir. 2000).

Since Moore was decided, the Supreme Court has spoken directly to the question whether a particular impairment qualifies as a "disability" for ADA purposes. See Toyota Motor Mfg., Kentucky, Inc. v. Williams, 122 S.Ct. 681 (2002). In that case, the Court established a higher threshold for the statute than some had believed it contained. "'[S]ubstantially' in the phrase 'substantially limits' sug gests 'considerable' or 'to a large degree.'" Id. at 691 (alteration in original). "The word 'substantial' thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities." Id. The Court did not question the idea that walking is a basic enough activity to qualify as a "major life activity" under the statute. But Dvorak would have to show that his arthritis "prevents or severely restricts" him from walking, in a permanent or long-term way. Id. See al so Bragdon v. Abbott, 524 U.S. 624 (1998); 29 C.F.R. sec. 1630.2(i). It is difficult on the present record to make this determination: we would need to see whether Dvorak's arthritis met the Williams standard. Alternatively, we would have to decide whether Mostardi-Platt regarded him as so severely limited in his ability to walk (an alternative method of proof under the statute that Williams did not address). See 42 U.S.C. sec. 12102(2); see also Bekker, 229 F.3d at 670; Wright v. Illinois Dep't of Corrections, 204 F.3d 727, 730-32 (7th Cir. 2000) (discussing the guidelines for

deciding when an employee is "regarded as" having a disability).

We will assume for the sake of argument that Dvorak presented enough evidence to create a question of fact on the disability issue, though we express no opinion on the point. Dvorak's work had been restricted to desk duty only, and Mostardi-Platt discussed the limitations imposed by the disability on Dvorak's work performance with its labor counsel. Mostardi-Platt believed, as informed by Dvorak, that he might never regain his full ability to walk. The suggestion that Dvorak be placed on long-term medical leave also supports a finding that Mostardi-Platt regarded Dvorak as being physically impaired.

Taking his disability as a given, we must next determine whether there was a genuine issue of fact about Dvorak's qualifications to perform the essential functions of his job. Under the ADA, a "qualified individual with a disability" is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. sec. 12111(8) (emphasis added). See also Bultemeyer v. Fort Wayne Cmty. Sch., 100 F.3d 1281, 1284-85 (7th Cir. 1996). The district court found that there were factual disputes over the exact description of his functions that would have precluded a grant of summary judgment on this ground alone. This is a close call, but we once again assume favorably (and generously) to Dvorak that with the appropriate accommodations he could have still performed either this work or other work Mostardi-Platt might have been required to find for him.

We note, however, that Dvorak would have great trouble reaching the jury on the issue whether he could perform the job without accommodation. However vague his official job description might have been, it is clear from the record that it required a significant degree of field work and mobility. Dvorak himself claimed that he no longer possessed the physical ability to perform those functions. His later position that he could have completed all his "essential duties" with a desk position accommodation is of no avail. Under the ADA, an employer is not required to modify, reduce, or reallocate

the essential functions of a job to accommodate an employee. Emerson v. Northern States Power Co., 256 F.3d at 514. Mostardi-Platt concluded that a "desk work only" medical restriction could not be accommodated, given the demands of Dvorak's job. Thus, it appears that without accommodation Dvorak could not perform the job.

What about with accommodations? There is little suggestion that Dvorak sought any other available positions, with the exception of an off-handed mention that he might be moved to an accounting position that might have eventually opened. He was deemed unfit for the accounting position, and correctly so: as he himself stated in an e-mail to Macak, he had not as of that time even completed the course work necessary to qualify as an accountant. In addition, to the extent that Dvorak would like to prevail on the theory that Mostardi-Platt failed to accommodate his disability, he runs into problems with the interactive nature of the accommodation process. See Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996); Bultemeyer, 100 F.3d at 1284, 1285. Dvorak does not seem to have engaged in good-faith negotiations about possible accommodations: the threshold of cooperation set by Bultemeyer requires serious efforts from both parties. On the other hand, one might see Dvorak's ouster from his office on April 3 as a signal that Mostardi-Platt had already decided that all accommodations were pointless, and thus that further conversation would be similarly futile. Giving Dvorak the benefit of the doubt, we will assume that this is the case and proceed.

With Dvorak's disability, qualifications, and adverse job action established, the burden of production shifts to the employer to articulate a nondiscriminatory motive for the termination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Bellaver v. Quanex Corp., 200 F.3d 485, 493 (7th Cir. 2000); DeLuca v. Winer Indus., Inc., 53 F.3d 793, 797 (7th Cir. 1995). If the employer does so, the inference of discrimination disappears, and the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason was a pretext for intentional discrimination. Id. The

ultimate burden to prove intentional discrimination remains with the plaintiff. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993).

Here, Mostardi-Platt urges that it terminated Dvorak for at least two nondiscriminatory reasons: first, his overall poor performance record that culminated in the insubordinate April 1 memo, and second, his misuse of the laptop. Dvorak disagrees with the former on the ground that the record shows he was really an excellent employee; he attacks the latter as after-acquired evidence that cannot be used to justify his termination. His point about after-acquired evidence requires a short digression into the question when his termination occurred. Dvorak contends that he was fired on April 3, 1997, before the laptop problem was discovered, and not on May 28, 1997. If he is correct, Mostardi-Platt is left only with the inflammatory memorandum and its documentation about Dvorak's unsatisfactory performance as a reason for his termination. If, on the other hand, he was terminated on May 28, Mostardi-Platt could rely also on the discovery of his misconduct with respect to the laptop. (We note that this dispute makes less practical difference to the case than Dvorak may think. If we used the April 3 date, it is true that the company could not rely on the after-acquired evidence to justify that termination date. But, as McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352 (1995), pointed out, after-acquired evidence may be considered in the determination of the proper remedy for an unlawful act, and typically, backpay may run only from the date of the unlawful discharge until the date the employer would have terminated the employee based on the later evidence. Mostardi-Platt knew about the laptop before the end of April, and thus any backpay award would have covered only the days between April 3 and the date of discovery.)

Although the exact date of termination is partly a factual question, the facts must be evaluated in the light of the proper legal test. Such a test has been established in the context of statute of limitations issues, where the employee generally tries to show as late a date of termination as possible. This court

adopted an "unequivocal notice of termination" test in Mull v. ARCO Durethene Plastics, Inc., 784 F.2d 284 (1986), agreeing with the approach developed by the Fifth and the Third Circuit. The Fifth Circuit rule provides that termination occurs when the employer shows, by acts or words, clear intention to dispense with the employee's services. Payne v. Crane Co., 560 F.2d 198, 199 (5th Cir. 1977). In Bonham v. Dresser Indus., Inc., 569 F.2d 187, 191 (3d Cir. 1977) the Third Circuit explicitly rejected a rule that focused on an official termination date, on the grounds that, as the employer controls such records, it would be unfair to the employee to have the timeliness of her claim determined by unilateral actions, or statements as to such actions, by the employer. See also Thurman v. Sears, Roebuck & Co., 952 F.2d 128, 134 (5th Cir. 1992) (termination occurs "when the employee receives unequivocal notice of his termination or when a reasonable person would know of the termination."); Tolle v. Carroll Touch, Inc., 977 F.2d 1129 (7th Cir. 1992) (endorsing "unequivocal notice of termination" test for actual date of termination).

We too think that one must look at all the circumstances to find out what the employer really did, and when. To that end, Dvorak urges us to find that his orders to clear everything out of his office on April 3 show that Mostardi-Platt had no intention of ever allowing him to return and that the company implemented a de facto termination at that time. But other undisputed evidence in the record precludes this interpretation of the April 3 events. Both the outcome of the April 3 meeting and the conduct of both parties in the weeks that followed are inconsistent with a reasonable understanding of the April 3 action as a final termination. At the close of the meeting, Dvorak was told that he was being placed on medical leave; this is an action consistent only with continued employment. Under the FMLA, an employer has a number of obligations toward an employee on leave, whether or not the leave is with pay. We are sure that Mostardi-Platt does not extend FMLA leave to non-employees, or recently terminated employees. (COBRAbenefits are another matter, but no one is arguing that this is what Dvorak

was pursuing.) Indeed, had Dvorak truly believed that he had been terminated on April 3, the steps he took to be placed on FMLA leave would now smack of fraud. To be eligible for FMLA benefits, one must at a minimum be an "employee," not a "recently terminated employee." See 29 U.S.C. sec. 2612(a)(1) (referring to "eligible employee"). A termination decision makes one ineligible for FMLA benefits, and thus both Dvorak's attempt to obtain such benefits and Mostardi-Platt's efforts to process the paperwork belie the contention that Dvorak was terminated on April 3. See Brohm v. JH Properties, Inc., 149 F.3d 517, 523 (6th Cir. 1998).

Further, between April 4 and May 27, Dvorak asked for clarification as to his employment status and was never told that he had been terminated. Rather, Mostardi-Platt's inquiries as to his conduct with respect to the laptop misuse suggest that he was still considered an employee. Dvorak's own request for clarification, likewise, tends to show that any notice he might have received of his termination was not all that unequivocal.

While the district court gave short attention to the timing question, it did conclude in a footnote that May 28 was the date of termination. We agree. Dvorak neither treated the decision of April 3, 1997, as a termination, nor should he have known that this is what Mostardi-Platt was really doing to him. He had met with management, he had told them of his severe work restrictions, and management suggested that he go on medical leave. While the order to clear out his desk was hardly a friendly gesture, this order alone is simply not enough to support a finding of the earlier termination date. Consistent with Dvorak's claim that he did not know how long it would be before he would recover (or if he ever would), Mostardi-Platt might have asked him to clean out his desk just to make space for his temporary replacement. This does not amount to a display of termination: that is precisely the notion of "leave."

With no competent evidence to support a termination date earlier than May 28, the laptop misuse is not information that the employer learned after the termination; it may thus be considered as one of Mostardi-Platt's nondiscriminatory

reasons for terminating Dvorak. Furthermore, even if we are wrong about all that and the April 3 date controls, Mostardi-Platt may still rely on its dissatisfaction with Dvorak's performance and its reaction to his inflammatory memorandum of April 1, 1997. Dvorak admitted that his productivity numbers were far below expectations. Employers cite poor performance and insubordination frequently as reasons for dismissing employees. In themselves, these reasons have nothing to do with the employee's disability or any other forbidden category.

Once Mostardi-Platt offered its evidence of nondiscriminatory motive, Dvorak still had a chance to rebut its asserted nondiscriminatory grounds for his termination. But a rebuttal must tend "to show that the employer's reasons for some negative job action are false, thereby implying (if not actually showing) that the real reason is illegal discrimination. . . . [T]he question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest." Kariotis v. Navistar Intern. Transp. Corp., 131 F.3d 672, 677 (7th Cir. 1997). The reasons proffered by Mostardi-Platt easily survive this test.

Dvorak has tried to meet that burden by producing evidence tending to show that he did not really misuse the laptop, and that he was doing a good job. But that evidence is unresponsive to the issue at hand. Dvorak needed to show instead that the decisionmakers at Mostardi-Platt did not believe that he had misused the computer and were lying when they expressed dissatisfaction with his work. As we have often noted, it does not matter whether the employer was ultimately wrong or unfair in the determination, nor whether a jury in the company's shoes would have fired him. Rather, Dvorak would need to show that not even the employer believed the reasons it proffered for firing him. He can point to nothing that suggests that the Mostardi-Platt officials did not genuinely think they were dealing with a problem of computer misuse. Furthermore, Dvorak has not shown that the decisionmakers were dissembling when they characterized the April 1 memorandum as totally unsatisfactory and something that

caused them to lose all confidence in Dvorak. In short, he has no evidence from which a trier of fact could legitimately find that the company's reasons were pretextual.

III

For these reasons, we Affirm the district court's grant of summary judgment in favor of Mostardi-Platt.