Larry BERTINETTI, Plaintiff,

v.

**JOY MINING MACHINERY,**
Defendant.

No. 2001–CV–4191–JPG.

United States District Court,
S.D. Illinois.

Oct. 9, 2002.

Stephen W. Stone, Howerton, Dorris & Stone, Marion, IL, for plaintiff.

Edward S. Bott, Jr., Jill K. Luft, Greensfelder, Hemker et al., St. Louis, MO, for defendant.

## *ORDER*

GILBERT, District Judge.

This matter comes before the Court on the defendant's motion for summary judgment. (Doc. 18). The plaintiff has responded (Doc. 20), and the defendant has replied (Doc. 21). For the reasons discussed below, the Court will grant the motion for summary judgment. Also before the Court, is the defendant's motion for leave to file a separate statement of facts, *instanter,* which will be granted (Doc. 23).

### *I. STANDARD*

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Baron v. City of Highland Park,* 195 F.3d 333, 338 (7th Cir.1999) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In this case, the Court must review the record in the light most favorable to Bertinetti and draw all reasonable inferences in his favor. *See Del Raso v. United States,* 244 F.3d 567, 570 (7th Cir.2001).

### II. BACKGROUND [1]

The plaintiff, Larry Bertinetti, has brought this case under the Americans with Disabilities Act, alleging that his employer, Joy Mining Machinery (hereinafter "Joy"), failed to reasonably accommodate his alleged disability. Joy is a supplier of underground mining systems for the extraction of coal and other bedded materials. Joy's Mt. Vernon, Illinois service center rebuilds and repairs mining systems. Bertinetti was employed by Joy at the Mt. Vernon service center, primarily as a boring mill operator. Steve Pace and Danny Bryant (who are not parties in this case) supervised Bertinetti when he worked the boring mills.

The Mt. Vernon service center utilizes six boring mills. A boring mill is a large machine which is generally used to repair used mining systems. The operation of a boring mill requires the boring mill operator to use a crane to hoist parts onto the mill, tighten bolts to secure the part on the mill, and engage levers and push buttons to operate the mill. To operate Joy's boring mills, the boring mill operator may be required to use his hands, legs or feet. As a general rule, Joy's boring mill operators may be required to operate any of Joy's six boring mills depending upon the work to be done.

While employed as a boring mill operator, Bertinetti operated Joy's # 1, # 4, # 5 and # 6 boring mills. Joy's Mill # 5 is surrounded by an 8–10 inch platform that allows the boring mill operator to stand higher while operating the machine. The platform surrounding Mill # 5 can be removed from the machine, thereby allowing

---

1. Pursuant to Local Rule 7.1(h) the parties have submitted a joint statement of undisputed facts. (Doc. 22). The defendant has supplemented the joint statement of undisputed facts with a separate statement of facts that the defendant contends are supported by un- contradicted evidence in the record (Docs.24). The Court has conducted its own review of the record. Unless the Court indicates otherwise, the facts recited below are either undisputed or are supported by uncontradicted evidence.

the operator to use the machine without having to step up onto the platform. There is no platform around Mill # 6, and, therefore, operators are not required to step-up to use the mill. Additionally, Mill # 6 is easier to operate than the other boring mills because smaller parts are ordinarily run on that machine.

Bertinetti was diagnosed with Charcot–Marie–Tooth disease (hereinafter "CMT") in June 1994. CMT is a hereditary condition affecting the peripheral nervous system. CMT may affect both the lower and upper extremities and is indicated by an atrophy of muscles. Bertinetti testified in his deposition that CMT limits his ability to walk. He testified that he can walk only one-hundred yards without stopping to rest. He testified that CMT also limits his ability to walk because it affects his balance. He testified that he can climb stairs with the assistance of a hand rail. He testified that he lives in a two-story home but that he stays on the first floor. He testified that he climbs three steps from the outside ground level to the entryway of his home on a daily basis. He testified that he can stand fifteen to twenty minutes without resting. He testified that CMT does not limit his ability to do yard work, to do minor household chores, to care for himself, to perform personal hygiene, to drive, to get dressed, to lift, to reach or to perform manual tasks. Bertinetti testified that he was able to hunt deer and squirrel and to fish through the fall of 1999.

The effects of CMT may be mitigated through the use of corrective shoes, leg or ankle braces, and/or a walking stick or cane. With the exception of corrective shoes, Bertinetti has not taken any other potentially mitigating measure.

Bertinetti first informed Joy about his limitations resulting from CMT in 1995 via a letter from Dr. Richard Morgan. Dr. Morgan sent a letter dated April 5, 1995, to Joy's Human Resources Director Sharon Whipple explaining the general nature of CMT and stating that Bertinetti would "experience muscular weakness from time to time" and that he would "need periods of rest to prevent further strain or injury."

On or about April 1, 1998, Bertinetti provided a second letter from Dr. Morgan to Joy Mining's Plant Manager Bill Irman. Dr. Morgan's second letter, dated April 1, 1998, stated that Bertinetti had CMT which necessitated the wearing of orthopedic shoes. At the time Bertinetti presented the letter to Bill Irman, Bertinetti already wore orthopedic shoes to work. No one ever told Bertinetti that he could not wear orthopedic shoes to work.

On or about June 29, 1998, Bertinetti provided Pace a third letter from Dr. Morgan, dated June 29, 1998, referencing Dr. Morgan's April 5, 1995 letter and stating that Bertinetti's condition and work considerations were unchanged. In his deposition, Bertinetti testified that around this time (apparently late June 1998), he was having problems operating Mill # 5—"I was having trouble stepping up and down off the platform, climbing on the table, operating the machines as far as gears and levers." Bertinetti testified that he discussed the difficulty he was having with Pace, Bertinetti's foreman at the time, but that Pace made no response. Bertinetti testified that he did not complain to anyone else.

On or about July 22, 1998, Bertinetti presented Pace with two letters, one prepared by Bertinetti and one from Dr. Bob Thompson, both dated July 22, 1998. Bertinetti's letter was directed to Pace and stated, as follows: "I was recently taken off a # 6 mill to run a much more physically difficult machine, in which I am having physical problems with." Further, Bertinetti's letter requested an accommodation under the ADA, specifically that he be

reassigned to Mill # 6. Dr. Thompson's letter stated in regards to Bertinetti as follows: "needs to change from present position due to stepping up and down—patient has arthritic changes of right ankle." Within two to three days of providing the letters to Pace, Bertinetti was assigned Mill # 6 as his principal station. Mill # 6 remained his principal work station until April 1999.

However, even after being assigned to Mill # 6, Bertinetti was instructed to operate Mill # 5 on approximately five occasions between late July 1998 and April 1999. Bertinetti testified that the "majority" of these five times, the platform surrounding Mill # 5 was removed so that Bertinetti could operate the mill without having to step-up onto the platform. Nevertheless, Bertinetti testified in his deposition that he continued to have difficulty operating Mill # 5. In particular, Bertinetti testified that he had difficulty engaging and disengaging levers, which apparently required Bertinetti to balance on one leg. Drawing inferences favorable to Bertinetti, it appears that Bertinetti would not have been required to balance on one leg to operate Mill # 6, and, thus, would have been able to operate Mill # 6 without difficulty. Bertinetti testified at his deposition that he told Pace that it was difficult for him to stand on one leg and that he complained every time Pace put him on Mill # 5. However, later in the same deposition, he testified that prior to June 7, 2000, he had not told anyone at Joy that he could not stand on one leg or that he had difficulty operating the levers with his feet. Rather, he testified that his letter of July 22, 1998, was the only time he communicated to anyone at Joy any difficulty operating Mill # 5. His letter of July 22, 1998, did not specifically mention any difficulty associated with standing on one leg or operating the levers on Mill # 5. In any event, Bertinelli does not contend that Joy failed to reasonably accommodate his al-leged disability at any time before June 7, 2000.

On April 5, 1999, Bertinetti voluntarily bid into a Computer Numeric Control (hereinafter "CNC") operator position. A CNC machine is a large computer operated machine which is used to repair parts. The CNC machine utilized by Joy in 1999 only required the operator to push buttons to program a computer. The CNC machine was surrounded by a 4 inch platform. Bertinetti obtained the CNC operator position. The platform surrounding the CNC machine was removed so that Bertinetti would not have to step-up onto the platform to operate the machine. Bertinetti testified that he had no problems running the CNC machine.

On June 7, 2000, however, Danny Bryant, Bertinetti's supervisor at the time, assigned Bertinetti to Mill # 5 to perform a particular task. Bertinetti testified that he balked at Bryant's order to operate Mill # 5, and explained that Mill # 5 was "difficult to run." Bertinetti testified that Bryant said he was fully aware of Bertinetti's disability but nevertheless ordered Bertinetti to work on Mill # 5. The platform surrounding Mill # 5 was removed so that Bertinetti would not need to step-up to operate the mill. Bertinetti testified in his deposition that while operating Mill # 5 on June 7, he was injured. Bertinetti testified that he was balancing on one leg, holding a lever down with his left foot when he felt a pain in his back and numbness in his left leg.

The June 7, 2000 incident is the only time Bertinetti believes he was discriminated against on the basis of his CMT. He has filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging that Joy failed to accommodate his CMT because, "[o]n June 7, 2000, [Joy] mandated [Bertinetti] perform duties outside the parameters of [his] med-

ical restriction." The plaintiff filed this suit alleging that Joy "insisted that he perform a job function that was beyond his restrictions and the accommodation afforded to him by defendant." *Complaint,* ¶ 10.

## III. *DISCUSSION*

"The ADA prohibits discrimination by covered entities, including private employers, against qualified individuals with a disability." *E.E.O.C. v. Sears Roebuck & Co.,* 233 F.3d 432, 437 (7th Cir.2000) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 477, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). The ADA provides, in part, that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual . . . ." 42 U.S.C. § 12112(a). "Section 12112(b) of the Act defines the different ways in which discrimination under section (a) might occur." *Sears Roebuck,* 233 F.3d at 437. Relevant to the instant case, the ADA states that "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee" is considered discrimination, "unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).[2]

Before reaching the reasonable accommodation issue, however, the plaintiff must put forward evidence from which a reasonable jury could conclude: "(1) that [he] was or is disabled as defined by the Act, (2) that [his] employer was aware of the disability, and (3) that [he] was qualified for the position in question." *Sears Roebuck,* 233 F.3d at 437 (citing *Best v. Shell*

*Oil Co.,* 107 F.3d 544, 547–48 (7th Cir. 1997)).

In this case, at the summary judgment stage, only the first of these elements is disputed. The defendant contends that Bertinetti is not disabled as defined by the Act, and that, therefore, summary judgment should be granted. Under the Act, a disability is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

It is not the Court's role to come to a decision as to whether Bertinetti is disabled under the ADA. *See EEOC v. Sears Roebuck Co.,* 233 F.3d 432, 438. Rather, the Court must decide whether a rational jury, viewing the evidence in the light most favorable to the plaintiff, could come to such a decision. *Id.* In this case, the plaintiff argues that a rational jury could find that he is disabled under Subsection (A) and/or (C) of Section 12102(2).

■ The purpose of Subsection (C)'s "regarded as" definition of a "disability" is to "cover individuals 'rejected from a job because of the myths, fears and stereotypes associated with disabilities.' " *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489–90, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (quoting 29 C.F.R. pt. 1630, App. § 1630.2(1)). A plaintiff may prove a "regarded as" claim by showing that either "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or

---

**2.** The *McDonnell–Douglas* burden shifting framework is inapplicable and inappropriate for analyzing reasonable accommodation claims, which are direct proof claims. *Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1283–84 (7th Cir.1996)

more major life activities." *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139.

■ Bertinetti only directs the Court to one piece of "evidence" in support of his "regarded as" theory. He notes that, in this litigation, the defendant has argued that it "reasonably accommodated" the plaintiff. Thus, Bertinetti argues, the defendant has admitted that it regards the plaintiff as being disabled under the ADA. Bertinetti, however, has not directed the Court's attention to any evidence that the defendant regarded Bertinetti as being substantially limited in his ability to perform a major life activity during the relevant time period. Joy's argument that it provided a reasonable accommodation, which is presented only as an alternative basis for summary judgment, is no evidence at all. Moreover, this Court agrees with the Ninth Circuit which has recently stated:

> [W]hen an employer takes steps to accommodate an employee's restrictions, it is not thereby conceding that the employee is disabled under the ADA or that it regards the employee as disabled. A contrary rule would discourage the amicable resolution of numerous employment disputes and needlessly force parties into expensive and time-consuming litigation.

*Thornton v. McClatchy,* 261 F.3d 789, 798 (9th Cir.2001); *see also Plant v. Morton International, Inc.,* 212 F.3d 929, 938 (6th Cir.2000) (holding that evidence that employer accommodated the plaintiff's medical restrictions did not establish that the employer regarded the plaintiff as disabled under the ADA). Therefore, the Court finds that no rational jury could conclude, based on the evidence in the record, that Bertinetti is "disabled" under § 12102(2)(C). Thus, the plaintiff must proceed under § 12102(2)(A).

In *Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the Supreme Court identified a three-step test to determine if a physical or mental condition is within the scope of subsection (A) of the definition of disability. First, courts must determine whether the condition claimed is a physical or mental "impairment." *See id.* Second, courts must "identify the life activity upon which [the plaintiff] relies ... and determine whether it constitutes a major life activity under the ADA." *Id.* Third, courts must determine whether the impairment "substantially limits" this major life activity. *See id.*

In this case, the defendant does not dispute that CMT is a physical impairment. Moreover, there is no doubt that the major life activity upon which Bertinetti relies, walking, is a major life activity under the ADA. Major life activities include "caring for oneself, performing manual tasks, *walking,* seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (emphasis added). Thus, the key question at this stage of the analysis is whether Bertinetti's CMT "substantially limits" his ability to walk. The defendant contends that it does not.

"A 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Accordingly, this Court will not speculate about what Bertinetti's condition would be in the absence of mitigating measures that have actually been taken. On the other hand, the defendant urges the Court to consider that Bertinetti's condition might have been improved if he had utilized additional corrective devices. *Sutton,* however, does not give courts a license to "meander in 'would, could, or should-have' land." *Nawrot v. CPC Intern.,* 277 F.3d 896, 904 (7th Cir.2002). Courts should only consid-

er mitigating steps actually taken and the consequences that actually followed. *See id.* Accordingly, this court will not speculate about what Bertinetti's condition would be if he had taken additional steps to improve his condition.

In short, to survive summary judgment, Bertinetti must direct the Court to evidence in the record from which a rational jury could conclude that his CMT "substantially limits" his ability to walk, in a permanent or long-term way, taking into account the mitigating steps that have actually been taken and the consequences of those mitigating steps. In *Toyota Motor Manufacturing v. Williams,* the Supreme Court emphasized that the term "substantially limits" should be read "strictly to create a demanding standard for qualifying as disabled." 534 U.S. 184, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002)

It is undisputed that Bertinetti suffers from an "impairment." The Court does not believe, however, that his limitations constitute a "disability" under the ADA. Bertinetti is clearly not "prevented" from walking. Thus, the question is whether he is otherwise "substantially limited" in his ability to walk. Bertinetti testified that he cannot walk more than 100 yards without resting and that he can only stand 15–20 minutes without resting. His testimony also reveals that, at the relevant time, he had an active lifestyle. Bertinetti testified that he continued to fish and to hunt deer and squirrels through the fall hunting season of 1999. He also testified that he continues to do yard work and minor household chores.

■ The Court does not believe that a rational jury could find, based on this evidence and consistent with the law, that Bertinetti was substantially limited in his ability to walk at the relevant time. This conclusion is supported by closely analogous case law. *See, e.g., Moore v. J.B. Hunt Transport, Inc.,* 221 F.3d 944, 951 (7th Cir.2000) (holding that a plaintiff suffering from arthritis was not substantially limited in his ability to walk when he could walk up to one mile and his condition only affected the rate and pace of his activities); *Weber v. Strippit, Inc.,* 186 F.3d 907, 914 (8th Cir.1999) (holding that a plaintiff suffering from heart disease was not disabled under the ADA even though he had difficulty walking long distances or climbing stairs without getting fatigued); *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1025 (5th Cir.1999) (holding that a plaintiff suffering from a leg deformity was not substantially limited in her ability to walk when she walked with a limp and at a significantly slower rate than the average person); *Penny v. United Parcel Service,* 128 F.3d 408, 415 (6th Cir.1997) (holding that a reasonable jury could not find the plaintiff substantially limited in his ability to walk in light of his deposition testimony that he was able to go hunting and fishing); *Kelly v. Drexel University,* 94 F.3d 102, 106 (3d Cir.1996) (holding that plaintiff suffering from a hip injury was not substantially limited in his ability to walk when he could not walk a mile, could not jog and could only climb stairs slowly with the assistance of a rail); *Ingles v. Neiman Marcus Group,* 974 F.Supp. 996, 1002 (S.D.Tex.1997) (holding that plaintiff suffering from diabetes and missing several toes was not substantially limited in his ability to walk when the plaintiff could shop and tend to daily activities); *Barker v. Andrew Corp.,* No. 96 C 1111, 1997 WL 803866, at *1–4 (N.D.Ill.Dec.31, 1997) (holding that the plaintiff was not substantially limited in his ability to walk when he could not take long walks and was in a great deal of pain when he walked); *Graver v. National Eng'g Co.,* No. 94 C 1228, 1995 WL 443944, at *9–11 (N.D.Ill. July 25, 1995) (holding that plaintiff suffering from arthritis in his ankles was not substantially limited in his ability to walk

when he walked with a pronounced limp and felt pain and stiffness); *Stone v. Entergy Services, Inc.,* No. 94–2669, 1995 WL 368473, at *2–4 (E.D.La. June 20, 1995) (holding that plaintiff who was unable to run, walked slowly, had trouble climbing and descending stairs, and suffered from muscle weakness and partial paralysis as residual effects of polio, but did not need a walking aid, was not disabled under the ADA).

Notably, all of the cases cited above were decided without the benefit of the Supreme Court's decision in *Toyota Motor Manufacturing v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), a case in which "the Court established a higher threshold for the statute than some had believed it contained." *Dvorak v. Mostardi Platt Associates, Inc.,* 289 F.3d 479, 484 (7th Cir.2002).

Because Bertinetti has not put forward evidence from which a rational jury could conclude that he is disabled under the ADA, the Court need not consider whether a reasonable jury could conclude that the defendant failed to reasonably accommodate Bertinetti.

■ To the extent Bertinetti is attempting to raise a personal injury claim for an exacerbation of his condition or for injuries sustained on June 7, 2000, his remedy lies in tort or under the Illinois Worker's Compensation Act. *Accord Smith v. Blue Cross Blue Shield of Kansas,* 102 F.3d 1075, 1077–78 (10th Cir.1996).

Finally, the Court understands that Mr. Bertinetti suffers from a serious physical impairment that limits him in important ways. The Court does not consider his impairment to be insignificant. However, the Supreme Court has held that when Congress wrote the ADA it intended to create a "demanding standard for qualifying as disabled." *Williams,* 122 S.Ct. at 691. This Court has simply concluded that the evidence in the record would not allow a jury to conclude that Mr. Bertinetti meets that demanding standard, and the Court's decision is consistent with what other federal courts across the country have done in very similar cases.

## IV. CONCLUSION

The Court **GRANTS**, *instanter,* the defendant's motion to file a separate statement of facts (Doc. 23). For reasons discussed above, the Court hereby **GRANTS** the defendant's motion for summary judgment (Doc. 18). The Clerk of the Court shall enter judgment accordingly.

**IT IS SO ORDERED.**