*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0288P (6th Cir.)
File Name: 03a0288p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

O.J. DISTRIBUTING, INC., a/k/a
GREAT STATE BEVERAGE,
            *Plaintiff-Appellant,*

                v.

HORNELL BREWING
COMPANY, INC., d/b/a
FEROLITO, VULTAGGIO &
SONS, a/k/a ARIZONA
BEVERAGES,
            *Defendant-Appellee.*

No. 01-1583

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-71940—Denise Page Hood, District Judge.

Argued: January 28, 2003

Decided and Filed: August 14, 2003

Before: BATCHELDER, MOORE, and CLAY, Circuit
Judges.

————————————

## COUNSEL

**ARGUED:** Matthew A. Gibb, GIBB LAW FIRM, Shelby Township, Michigan, for Appellant. John A. Ruemenapp, WEISMAN, YOUNG, SCHLOSS & RUEMENAPP, Bingham Farms, Michigan, for Appellee. **ON BRIEF:** Matthew A. Gibb, GIBB LAW FIRM, Shelby Township, Michigan, for Appellant. John A. Ruemenapp, WEISMAN, YOUNG, SCHLOSS & RUEMENAPP, Bingham Farms, Michigan, for Appellee.

CLAY, J., delivered the opinion of the court, in which MOORE, J., joined. BATCHELDER, J. (pp. 28-31), delivered a separate opinion concurring in part and dissenting in part.

————————————

## OPINION

————————————

CLAY, Circuit Judge. Plaintiff, O.J. Distributing, Inc., a/k/a Great State Beverage, appeals from the district court's order entered on March 29, 2001 granting the motion brought by Defendant, Hornell Brewing Company, Inc., d/b/a Ferolito, Vultaggio & Sons, a/k/a AriZona Beverages, to confirm an arbitration award, while dismissing Defendant's motion to dismiss Plaintiff's amended complaint as moot, and dismissing Plaintiff's motion for summary judgment as moot. For the reasons set forth below, we **VACATE** the district court's order confirming the arbitration award, and **REMAND** the case to the district court with instructions that the case should proceed on the merits of Plaintiff's claims inasmuch as Defendant waived its right to arbitrate under the Agreement.

## BACKGROUND
### Procedural History

Plaintiff, a Michigan corporation, filed suit against Defendant, a New York corporation, in the Eastern District of Michigan on May 11, 1998, on the basis of diversity of citizenship and the amount in controversy being over $75,000, claiming that in May of 1997, Defendant breached the provisions of the "Distributing Agreement" ("the Agreement") held between the parties for the distribution of AriZona beverage products. Plaintiff mailed the complaint to Defendant's corporate counsel along with a request for waiver of service in May of 1998. The waiver had not been returned as of July of 1998, so Plaintiff sent an additional copy of the complaint to Defendant's corporate counsel via overnight courier.

On or about August 4 and 5, 1998, Defendant sent two letters to counsel for Plaintiff demanding arbitration. Defendant based its demand on a provision of the Agreement that provided for arbitration of any dispute that arose between the parties and that the arbitration must be commenced within 180 days following the event giving rise to the claim, and further provided that "the failure to abide by such time requirement shall constitute a waiver by the Distributor [Plaintiff] of any rights in respect of, and shall constitute a bar on, any claims by Distributor on the basis of such event or circumstance." (J.A. at 52-53.) Defendant's letters advised counsel for Plaintiff of this provision in the Agreement requiring arbitration of all disputes.

On September 4, 1998, via "telecopier and mail," Defendant restated its objections to Plaintiff's attempted service by overnight courier and reiterated that Plaintiff's claims were subject to "mandatory arbitration." The letter also advised Plaintiff that Defendant "was willing to continue a dialogue with you in the hopes of achieving at [sic] an amicable settlement of your claims. Please call if you are interested." (J.A. at 115.) Plaintiff arranged for an entry of

default on September 30, 1998, with the Clerk of the United States District Court for the Eastern District of Michigan, and on October 2, 1998, Plaintiff filed a motion for Entry of Default Judgment.

Defendant claims that it was not served with any papers regarding Plaintiff's actions with respect to the entry of default, but learned of Plaintiff's actions by way of a voice-mail message from Plaintiff's attorney to Defendant's counsel. Defendant responded by sending a letter to the district court "Via Facsimile" with a copy to Plaintiff's counsel wherein Defendant explained that entry of default was inappropriate because Defendant had not been served in the action, and that Defendant had served Plaintiff with a demand for arbitration as required under the Agreement. At that time, Defendant also filed a cross-motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(5) for insufficiency of service of process, and moved to dismiss or stay the action pending arbitration.

On October 5, 1998, Defendant initiated arbitration proceedings before the American Arbitration Association ("AAA") in New York City, New York and, in accordance with the AAA rules, Defendant served the arbitration papers on Plaintiff via certified mail, return receipt requested. By letter dated October 20, 1998, the AAA acknowledged receipt of Defendant's arbitration demand and requested Plaintiff's responses thereto. The AAA also scheduled an administrative conference regarding the matter for October 27, 1998, and provided information and papers with which the parties were to begin the process of selecting arbitrators and hearing dates.

Plaintiff filed a motion on October 28, 1998, seeking a temporary restraining order preventing Defendant from arbitrating the matter. On November 3, 1998, the district court denied Plaintiff's motion for a temporary restraining order, and scheduled a hearing for the various other motions. Thereafter, the district court entered an order on April 2, 1999, denying Defendant's motion to dismiss, while also

denying Plaintiff's motion for entry of a default judgment, but granted Defendant's motion to stay the proceedings pending arbitration.

In the meanwhile, the arbitration set in New York City was going forward. On April 19, 1999, Plaintiff filed its arbitration summary and statement of issues with the AAA setting forth a claim for damages under the Agreement. Defendant, upon consent of the arbitrators, filed a motion to enforce the 180-day contractual time limitations as set forth in the Agreement, and thereby requested a dismissal of Plaintiff's claims as time-barred. Defendant argued that the 180-day time limit barred Plaintiff's claim and that "[u]nder New York law (which governs this dispute as per ¶ 20.2 of the Agreement), it is well established that only the arbitrators (and not the Courts) are charged with enforcing a contractual time limitation." (J.A. at 531-32 (citation omitted).) Plaintiff responded by claiming that the 180-day period did not begin to run until April 8, 1998, and that Defendant's filing of its demand for arbitration on October 5, 1998 satisfied the time limitation period. In the alternative, Plaintiff argued that because of Defendant's alleged false and deceptive acts throughout the arbitration process, the limitations period should be tolled under the doctrine of equitable tolling. A hearing before the arbitrators was held on March 13, 2000, regarding Defendant's motion to dismiss Plaintiff's claim as untimely.[1] Thereafter, on or about March 30, 2000, the arbitrators issued their award dismissing Plaintiff's claims in their entirety.

On May 5, 2000, Plaintiff, filed an amended complaint in the district court. Defendant filed a motion on May 22, 2000, seeking to confirm the arbitration award and to dismiss

---

[1] Although Defendant makes reference to testimony taken at this hearing in its brief on appeal, (Defendant's Br. on Appeal at 9), no transcript of the hearing is provided in the joint appendix and, according to Plaintiff, "there is no transcript of this hearing." (Plaintiff's Br. on Appeal at 4.)

Plaintiff's amended complaint. (J.A. at 216.) Plaintiff, in turn, filed a motion for summary judgment. The district court held a hearing on the various motions on August 11, 2000, and then entered a memorandum opinion and order on March 29, 2001, confirming the arbitration award and finding the remaining motions moot.

Plaintiff timely appealed from the district court's March 29, 2001, memorandum opinion and order confirming the arbitration award and denying Plaintiff's motion for summary judgment as moot. Oral argument was heard on January 28, 2003, after which Defendant moved to file a supplemental brief as to a case raised by the panel at oral argument, *General Star National Insurance Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434 (6th Cir. 2002). Defendant's motion was granted and its supplemental brief has been considered by this Court.

### Facts

#### A. Background of the Relationship Between the Parties

Defendant is a supplier of certain alcoholic and non-alcoholic beverages including AriZona brand teas and soft drinks.[2] Plaintiff is a distributor of non-alcoholic beverage products in the greater Detroit, Michigan area. In April of 1995, Defendant began supplying AriZona beverage products to Plaintiff for distribution in three Michigan counties: Wayne, Oakland, and Macomb. About two months later, on June 16, 1995, Plaintiff entered into a sales agreement ("the Sales Agreement") with a third party for the purchase price of $70,000, for purposes of securing the rights to distribute AriZona products in two additional Michigan counties,

---

[2] Unless otherwise specified, throughout this opinion, the term "Defendant" shall refer to Hornell and the names under which it has been known or operated.

Livingston and Washtenaw. According to Plaintiff, Defendant had to consent to Plaintiff purchasing the rights to distribute AriZona products in these two additional counties. Thereafter, on September 16, 1995, Plaintiff and Defendant entered into the Agreement now at issue for the purpose of providing the terms under which Defendant would supply and Plaintiff would distribute AriZona products.

Each party not only performed under the Agreement, but Plaintiff allegedly met and exceeded the set sales goals and expended considerable time and resources in exceeding the expected market growth for AriZona products. Plaintiff claims that its efforts resulted in a large and profitable customer list for AriZona products. The performance continued until April of 1997, when AriZona informed Plaintiff that it was terminating the relationship.

## B.    Events Giving Rise to the Matter at Hand

AriZona sent a letter to Plaintiff on April 22, 1997, informing Plaintiff that it was "concluding our non-alcoholic supplier relationship with you" effective May 12, 1997. (J.A. at 155.) The letter was written on AriZona letterhead, signed by Ted Shanahan, Eastern Division Manager, and copied to "Don Vultaggio" at Hornell Brewing in Long Island, New York, as well as to "Lawrence I. Fox" an attorney at McDermott, Will, and Emory ("MW&E") in New York, New York. The letter made no reference the Agreement.

In response, on April 24, 1997, Eric Smith, Plaintiff's then counsel, sent a letter to Shanahan acknowledging receipt of the termination letter and informing Shanahan that 1) "[t]he relationship between the parties is subject to an executed Agreement dated September 16, 1995;" 2) the April 22, 1997 letter did not constitute termination "for cause" and under the terms of the Agreement, if Defendant terminated the Agreement without cause, Defendant had to provide Plaintiff with at least thirty days notice; 3) AriZona's legal obligations under the Agreement demanded that certain monies be paid

to Plaintiff; and 4) AriZona's actions constituted a breach of the Agreement. (J.A. at 189.) The letter also advised AriZona that if it was not willing to act pursuant to the terms of the Agreement, Plaintiff would not hesitate to take legal action. The letter was copied to, among others, Don Vultaggio and Lawrence I. Fox, and sent by certified mail with return receipt requested. The record indicates that Vultaggio and Fox each received the letter. (J.A. at 191-92.)

On April 29, 1997, attorney Lisa S. Derman, of MW&E sent a letter to Plaintiff's former counsel Smith, advising Smith that the "firm [McDermott, Will & Emery] [was] litigation counsel for Hornell Brewing Co., Inc. d/b/a Ferolito, Vultaggio & Sons ("Hornell")." (J.A. at 196.) The letter also apprised Smith that his "letter of April 24, 1997, to Mr. Ted Shanahan ha[d] been forwarded to [Hornell] for response." (J.A. at 196.) Finally, the letter advised that MW&E was in the process of reviewing the matter with Hornell, and would contact Smith after gathering "the relevant information." (J.A. at 196.) The letter was copied to Shanahan and Fox.

Smith sent a letter to Derman on May 2, 1997 advising her that he had received a direct communication from Shanahan asking Smith to contact him to "discuss an amicable resolution of the matter." (J.A. at 194.) Smith stated that he was hesitant to contact Shanahan directly inasmuch as Derman had indicated that MW&E was representing Hornell, and asked Derman to advise accordingly.

Apparently Derman posted no objection to Smith directly contacting Shanahan, inasmuch as Shanahan sent a letter to Smith on May 7, 1997 indicating that, pursuant to a telephone conversation on May 5, 1997, Smith agreed to send Shanahan a complete copy "of a [sic] what O.J. Distributing claims is their 'contract' along with case sales information for Washtenau [sic] and Livingston counties[,]" but that Shanahan had yet to receive the materials. (J.A. at 193.) Shanahan therefore asked Smith as to when the materials would be sent. (J.A. at 193.)

Smith replied in a May 9, 1997, letter to Shanahan indicating, among other things, that Shanahan's "summation of our conversation [was] not accurate. I am not sending you a copy of anything O.J. Distributing drafted. It is AriZona's contract that it uses for its distributors in this area. It has been executed by your representative." (J.A. at 197.) Smith also discussed monies owed to Plaintiff under the terms of the Agreement. (J.A. at 197-98.) Smith sent another letter to Shanahan on May 14, 1997, indicating additional monies owed to Plaintiff under the terms of the Agreement. (J.A. at 200.)

On June 5, 1997, Shanahan sent a letter to Smith requesting copies of Plaintiff's last twelve months "Sales & Inventory" reports for O.J. Distributing. Shanahan advised that "[w]e are hoping to amicably resolve this matter as soon as possible." (J.A. at 201.) On July 1, 1997, Smith sent a letter to Shanahan in response to the June 5, 1997, correspondence indicating that all of the information requested had been sent, and that Smith therefore had "all of the information required to make the calculations necessary to move forward toward a resolution of this matter." (J.A. at 199.) Thus, Smith asked that Shanahan provide his "calculations by the next week's end so that we know more precisely where this matter is going to ultimately head." (J.A. at 199.) Smith added, "[i]f we are going to resolve the situation, we need to address it immediately." (J.A. at 199.)

Plaintiff's current counsel Matthew Gibb, sent a letter to attorney Lawrence I. Fox at MW&E on December 12, 1997, indicating that Gibb was representing Plaintiff and that Gibb was writing regarding the breach of the Agreement by Fox's client, Hornell. Gibb requested that Fox contact him regarding the matter. A few weeks later, on January 9, 1998, Gibb sent letter to Don Vultaggio at Hornell Brewing indicating that Gibb represented Plaintiff, that Hornell terminated the Agreement with Plaintiff, and that Gibb attempted to resolve the matter with Lawrence Fox, but Fox

did not return Gibb's letters or phone calls. Gibb asked that Vultaggio contact him regarding the matter.

Gibb sent a letter to attorney John Calandra of MW&E on January 15, 1998, regarding Plaintiff's claims against Defendant. The letter states that "[a]ttached is a copy of the Sales Agreement assigning Hornell's Distributor Agreement with [Plaintiff]." (J.A. at 160.) The letter further provides a summary of damages that Plaintiff believes it is due under the terms of the Agreement.

Several days later, on January 27, 1998, Gibb sent a letter to Calandra and Fox requesting that they advise how they were going to proceed inasmuch as they had "already stated that attempts at litigation or arbitration would be opposed . . . ." (J.A. at 162.) Gibb added that he "look[ed] forward to discussing how these claims may be settled or if it will be necessary to send this matter to arbitration or the federal court." (J.A. at 162.)

On February 11, 1998, Gibb sent yet another letter to Calandra requesting that Calandra respond to Gibb's January 15, 1998 letter and advise how Hornell wished to proceed. Gibb also requested that "[i]n the event this matter does proceed to litigation, would you prefer to accept service or should Hornell be served personally?" (J.A. at 163.) Several weeks later, on March 27, 1998, having heard no reply, Gibb sent a letter to Calandra stating that "[m]y client has not received a response to their claim against Hornell Brewing. As no offer of settlement or request for arbitration appears likely, I am advising my client to seek relief from the United States District Court. Please advise on how service should be perfected in this matter. I understand your client is not registered to do business in Michigan under their corporate name and therefore, they do not have a local resident agent. . . . If you have a better solution to this matter, please call." (J.A. at 164.)

Donna Messina, corporate counsel to Hornell, sent a letter to Gibb on April 8, 1998, indicating that Hornell was not aware of the existence of any Agreement with Plaintiff, and asked that if such a document existed. Gibb forwarded a copy to Messina. On that same day, Gibb responded with a letter to Messina and enclosed Plaintiff's "Notice of Lawsuit and Request for Waiver of Service of Summons." (J.A. at 168.) Gibb added, "[a]s your company is not registered to do business in Michigan, I trust that you, as General Counsel, have the authority to accept this complaint. A self-addressed, stamped envelope is enclosed for your assistance." (J.A. at 168.)

Several weeks later, on May 26, 1998, Gibb sent a letter to Fox of MW&E stating:

When we last spoke I understood that your client, Hornell Brewing, was going to make a preliminary offer of settlement by May 22, 1998. As of the date of this correspondence, I have not received anything to present to my clients. Is the offer forthcoming? . . . If no offer is pending in this matter, I need to know if Hornell is agreeing to waive service of [sic] if they desire to incur costs under Rule 4. Please advise what position your client is taking.

(J.A. at 171.) Then, on June 22, 1998, in response to a facsimile, Gibb sent a letter to Messina acknowledging that he was in receipt of the facsimile, and advised that his "previous correspondence [was] clear as to what [his] client requires in this matter," and that if Hornell "ha[d] a counter proposal, [Plaintiff] would be happy to consider it. However, at this point, [Plaintiff] cannot delay any longer." (J.A. at 172.) Gibb concluded:

"I have not received the waiver of service as requested with my client's complaint. Therefore, I am forced to effectuate personal service in this matter. Under Rule 4 of FRCP, I will be entitled to all costs, including

attorneys fees. I do not believe that this matter is being given its proper attention and therefore, feel the Federal Court is my client's only source of relief. If Hornell has an offer in this matter, please fax it to my office upon your return on June 29, 1998. I look forward to hearing from you."

(J.A. at 172.)

On August 4, 1998, yet another attorney from MW&E, James R. Anderson, sent a letter to Plaintiff stating:

We represent Hornell Brewing Co., Inc. d/b/a Ferolito, Vultaggio & Sons ("Hornell") and have received a copy of a summons and complaint in an action styled *O.J. Distributing, Inc. v. Hornell Brewing Co., Inc.*, No. 98-71940 (E.D. Mich) (the "Action").

Under ¶ 20.3(b) of the above-referenced Distributor Agreement (the "Distributor Agreement"), the claims asserted by O.J. Distributing, Inc. ("O.J.") in the Action are subject to mandatory arbitration in New York City. Accordingly, Hornell hereby demands arbitration in New York City of O.J.'s claims and such counterclaims as Hornell may choose to interpose.

Hornell reserves its right to assert in such arbitration any and all defenses it may have to O.J.'s claims, including but not limited to those relating to the formation and terms of the Distributor Agreement.

Please have your attorney contact me to discuss the selection of arbitrators and other procedural and logistical matters.

(J.A. at 112-13.) Anderson copied Messina on the letter.

Anderson sent a letter to Gibb on August 5, 1998, indicating that Gibb's service of process was ineffective, and reiterating that Plaintiff's claims were subject to arbitration.

Anderson copied Donna Messina on the letter. Anderson sent another letter to Gibb on September 4, 1998, 1) confirming that Hornell's time to answer and/or move in response to Plaintiff's complaint had been extended to September 18, 1998; 2) advising that Hornell was not waiving any objection to the service of complaint; 3) Plaintiff's claims were subject to arbitration; and 4) Hornell was willing to continue in dialogue in the hope of reaching an amicable settlement. (J.A. at 115.)

On October 2, 1998, Anderson sent a letter to the district court regarding the entry of default, and adding that "Hornell has advised plaintiff's attorney on numerous occasions that there is no basis for this action because the contract that O.J. seeks to enforce herein requires arbitration of the present dispute." (J.A. at 116.) Thereafter, on October 5, 1998, Anderson sent a letter to Plaintiff enclosing the "Demand for Arbitration, filed today [October 5, 1998], instituting proceedings before the American Arbitration Association in New York." (J.A. at 118.) The letter was copied to Gibb and Messina.

## DISCUSSION

### I. Entry of Default

Plaintiff first argues that the district court erred in setting aside the clerk's entry of default and in dismissing Plaintiff's motion for a default judgment.

The decision whether to set aside an entry of default under Federal Rule of Civil Procedure 55(c) is reviewed for an abuse of discretion. *United Coin Meter Co., Inc. v. Seaboard Coastline R.R.*, 705 F.2d 839, 844 (6th Cir. 1983) (citing *Keegel v. Key West & Caribbean Trading Co., Inc.*, 627 F.2d 372, 373 (D.C. Cir. 1980)).

### A.   Legal Standards

The process by which a default may be entered by the clerk of court, and a default judgment entered thereafter by the district court, has been succinctly stated as follows:

The Federal Rules of Civil Procedure require a defendant to serve an answer within twenty days of being served with a summons and complaint. Fed. R. Civ. P. 12(a)(1)(A). Rule 55 permits the clerk to enter a default when a party fails to defend an action as required. The court may then enter a default judgment. Fed. R. Civ. P. 55(b)(1). A party against whom a default judgment has been entered may petition the court to set aside the default judgment under Rules 55(c) and 60(b) for good cause, and upon a showing of mistake, or any other just reason.

*Weiss v. St. Paul Fire & Marine Ins. Co.*, 283 F.3d 790, 794 (6th Cir. 2002).

"[I]t is important to distinguish between an entry of default and a default judgment." *United States v. Real Property & All Furnishings Known as Bridwell's Grocery & Video*, 195 F.3d 819, 820 (6th Cir. 1999) (hereinafter "*Real Property*"). That is, "'a stricter standard of review applies for setting aside a default once it has ripened into a judgment.'" *Id.* (quoting *Waifersong, Ltd. Inc. v. Classic Music Vending*, 976 F.2d 290, 292 (6th Cir. 1992)). Specifically, "'once the court has determined damages and a judgment has been entered, the district court's discretion to vacate the judgment is circumscribed by public policy favoring finality of judgments and termination of litigation'" as reflected in Rule 60(b). *Weiss*, 283 F.3d at 794 (quoting *Waifersong*, 976 F.2d at 292). However, under Federal Rule of Civil Procedure 55(c), "[f]or good cause shown, the court may set aside an entry of default . . . ."

"'[T]he district court enjoys considerable latitude under the 'good cause shown' standard of Rule 55(c)' to grant a defendant relief from a default entry." *Real Property*, 195 F.3d at 820 (quoting *Waifersong*, 976 F.2d at 292). The criteria used to determine whether "good cause" has been shown for purposes of granting a motion under Rule 55(c) are whether "'(1) the default was willful, (2) set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious.'"[3] *United Coin Meter Co.*, 705 F.2d at 844 (citations omitted) (quoting *Keegel*, 627 F.2d at 373); *see also Real Property*, 195 F.3d at 820. It has been found that a district court abuses its discretion in denying a motion to set aside an entry of default when two of the three factors have been demonstrated by the defendant: the defendant had a meritorious defense and no prejudice would result to the plaintiff if the matter were to go forward. *See Shepard Claims Servs., Inc. v. Willaim Darrah & Assoc.*, 796 F.2d 190, 193-94 (6th Cir. 1986).

Due process requires proper service of process for a court to have jurisdiction to adjudicate the rights of the parties. *Amen v. City of Dearborn*, 532 F.2d 554, 557 (6th Cir. 1976). Therefore, if service of process was not proper, the court must set aside an entry of default. *Id.*; *see also Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."); *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067 (6th Cir. 1990).

---

[3]The three-part inquiry made by a district court in determining good cause to set aside an entry of default has also been characterized as whether (1) the plaintiff will be prejudiced; (2) defendant has a meritorious defense; and (3) defendant's culpable conduct led to the default. *Berthelsen v. v. Kane*, 907 F.2d 617, 620 (6th Cir. 1990).

### B.   Analysis

Plaintiff attempted to receive a waiver of service from Defendant pursuant to Federal Rule of Civil Procedure 4(d). Rule 4(d)(2) provides in part:

An individual, corporation, or association that is subject to service under subdivision (e), (f), or (h) and that receives notice of an action in the manner provided in this paragraph has a duty to avoid unnecessary costs of serving the summons. To avoid costs, the plaintiff may notify such a defendant of the commencement of the action and request that the defendant waive service of a summons. The notice and request

(A)   shall be in writing and shall be addressed directly to the defendant, if an individual, or else to an officer or managing or general agent (other agent authorized by appointment or law to receive service of process) of a defendant subject to service under subdivision (h);

Fed. R. Civ. P. 4(d)(2)(A). Rule 4(h) provides in relevant part:

Unless otherwise provided by federal law, service upon a domestic or foreign corporation or upon a partnership or other unincorporated association that is subject to suit under a common name, and from which a waiver of service has not been obtained and filed, shall be effected:

(1)   in a judicial district of the United States in the manner prescribed for individuals by subdivision (e)(1), or by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to

receive service and the statute so requires, by also mailing a copy to the defendant . . . .

Fed. R. Civ. P. 4(h).

The district court noted that despite Plaintiff's attempts, it had not received a waiver of summons pursuant to Rule 4(d), and that, as a result, Plaintiff was required to comply with formal service of process. (J.A. at 716.) Specifically, the court opined:

> I think the parties agree that [Plaintiff's] request for waiver was in writing. It is unclear whether it was addressed to the appropriate officer or agent of [Defendant], and it's not clear whether the request informed [Defendant] of the consequences of complying or not complying with the request under Rule 4(d).
>
> * * *
>
> Because [Defendant] didn't give its consent to waive service, [Plaintiff] was then required to follow the formal procedure for service of process; and it's undisputed, I think, that [Plaintiff] did not properly affect [sic] service on [Defendant] under the rules.
>
> [Plaintiff] sent [Defendant] the Complaint and Summons by Airborne in care of [Defendant's] in-house counsel.
>
> It is not clear to me that under the Federal Rules overnight mail is not a proper – is a proper method of serving an officer agent or authorized agent. And even if were proper service, it is not clear that the receptionist – it's clear that the receptionist signed for it. And there isn't any evidence, I don't think, in this record that she is an authorized agent of [Defendant] to receive that kind of document.

(J.A. at 716-17.)

The district court did not err in concluding that service of process was not effected inasmuch as Plaintiff failed to receive a waiver of summons from Defendant, and failed to demonstrate that it served an "authorized agent" by virtue of an unknown receptionist signing for the overnight package for purposes of complying with Rule 4(d) or Rule 4(h). *See LSJ Inv. Co., Inc. v. O.L.D., Inc.*, 167 F.3d 320, 322 (6th Cir. 1999) (noting that where the facts are undisputed, determination of whether there was adequate service of process is a question of law); *see also Friedman v. Estate of Presser*, 929 F.2d 1151, 1154-156 (6th Cir. 1991) (finding that service of process under Rule 4(c)(2)(C)(ii), as amended by current Rule 4(d), requires copy of return of notice and acknowledgment form).

Therefore, the question becomes whether Plaintiff effected service of process under the alternative method of Rule 4(h); that being, the manner prescribed for individuals under Rule 4(e)(1). *See* Fed. R. Civ. P. 4(h)(1). Federal Rule of Civil Procedure 4(e)(1) provides:

> Unless otherwise provided by federal law, service upon an individual from whom a waiver has not been obtained and filed, other than an infant or an incompetent person, may be effected in any judicial district of the United States:
>
> (1) pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State; . . . .

The district court found that Plaintiff had complied neither with Michigan's procedures for effecting service of process, nor those of New York. On appeal, Plaintiff provides no argument as to whether it complied with the laws of either Michigan or New York for effecting service of process. From our independent review of those procedures, we conclude that

the district court did not err in finding that the procedures of both states were not properly met. *See* Mich. Ct. R. 2.105(D) (stating that service of summons and copy of the complaint must be made upon officer, resident agent, director, trustee, or person in charge of an office or business establishment of the corporation, and sending a summons and copy of the complaint by registered mail to principal office of corporation); N.Y. CPLR § 311 (McKinney 1999) ("Personal service upon a corporation or governmental subdivision shall be made by delivering the summons as follows: . . . to any other agent authorized by appointment or by law to receive service.")

Accordingly, the district court did not err in finding that Plaintiff had not properly effected service of process on Defendant, *see LSJ Inv. Co., Inc.*, 167 F.3d at 322, and therefore did not abuse its discretion in setting aside the entry of default. *See Amen*, 532 F.2d at 557. In light of this holding, we need not weigh the three factors a court considers when setting aside an entry of default when service of process has been properly effected, and Plaintiff's claim regarding the district court's denial of its motion for a default judgment is moot.

## II.   Stay Pending Arbitration

Plaintiff next argues that the district court erred in granting Defendant's motion to stay the proceedings pending arbitration where Defendant's actions constituted a waiver of the arbitration provision.

This Court reviews a district court's determination as to the arbitrability of a matter *de novo*. *M&C Corp. v. Erwin Behr GMBH & Co.*, 143 F.3d 1033, 1037 (6th Cir. 1998).

### A.   Legal Standards

"When a suit is brought in federal court on issues that by written agreement are subject to arbitration, the Federal

Arbitration Act requires that 'the court in which the suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration . . . shall . . . stay the trial of the action . . . .'" *ATAC Corp. v. Arthur Treacher's Inc.*, 280 F.3d 1091, 1094-095 (6th Cir. 2002) (quoting 9 U.S.C. § 3).

"[T]here is a strong presumption in favor of arbitration, and . . . waiver of the right to arbitration is not to be lightly inferred." *Cotton v. Slone*, 4 F.3d 176, 179 (2d Cir.1993); *see also* E. L. Kellett, Annotation, *Delay in Asserting Contractual Right to Arbitration as Precluding Enforcement Thereof*, 25 A.L.R. 3d 1171 (1969) (providing cases and general principles regarding when delay in enforcing an arbitration right constitutes waiver, laches, or default). However, as this Court recently recognized:

"[a]n agreement to arbitrate may be waived by the actions of a party which are completely inconsistent with any reliance thereon." *Germany v. River Terminal Ry. co.*, 477 F.2d 546, 547 (6th Cir. 1973) (per curiam). Although a waiver of the right to arbitration is "not to be lightly inferred," *MicroStrategy, Inc. v. Lauricia*, 268 F.3d 244, 249 (4th Cir. 2001) (internal quotation marks omitted), a party may waive the right by delaying its assertion to such an extent that the opposing party incurs actual prejudice. *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 131 (2d Cir. 1997) (recognizing that a party waives the right to arbitrate where it delays the invocation of that right to the extent that the opposing party incurs "unnecessary delay or expense") (internal quotation marks omitted).

*Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434, 438 (6th Cir. 2002) (alterations in *Gen. Star Nat'l Ins. Co.*).

In *General Star National Insurance Co. v. Administratia Asigurarilor de Stat* ("*General Star*"), the Plaintiff, General

Star National Insurance Company, an Ohio corporation, brought suit against Astra, S.A. ("Astra"), a Romanian state-owned insurance company, asserting claims for breach of contract and unjust enrichment. 289 F.3d at 436. Astra had assumed the reinsurance contracts of the defendant, Administratia Asigurarilor de Stat. *Id.* Astra did not respond to the plaintiff's complaint, and the plaintiff moved for a default judgment which the district court granted. *Id.* About one year later, Astra filed a motion to vacate the default judgment. *Id.* Astra claimed that the default judgment was void because of an alleged lack of subject matter jurisdiction due, in part, to a clause in the reinsurance contract requiring the parties to submit any disputes arising under the contract to mandatory arbitration, thereby making the issue of whether Astra was a successor in interest to the defendant a matter for arbitration, not a matter for the district court. *Id.* at 438. Astra also contended that the default judgment should be set aside based on improper service of process. *Id.* at 437. The district court denied Astra's motion to set aside the entry of a default judgment, and Astra appealed. *Id.*

On appeal, this Court examined Astra's claim that the district court lacked subject matter jurisdiction to hear the matter due to the contract's mandatory arbitration provision. In doing so, the Court also considered whether Astra waived its right to arbitrate, and opined as follows:

> Astra did not assert its purported right to arbitrate until it filed its motion to vacate the default judgment on March 16, 2000. General Star gave Astra actual notice of the lawsuit on October 16, 1998. Thus for 17 months, Astra remained idle while General Star incurred the costs associated with this action. Astra, moreover, sought arbitration only *after* the district court had entered a default judgment against it. Under these circumstances, we believe that Astra has waived its right to arbitrate. *Menorah Ins. Co. v. INX Reinsurance Corp.*, 72 F.3d 218, 222 (1st Cir. 1995) (concluding that the defendant waived its right to arbitrate where it "chose not to invoke

> arbitration from July 1992 until October 1993 and [the plaintiff] bore the costs of proceeding to try to obtain the sums it thought owed"); *Stone v. E.F. Hutton & Co.*, 898 F.2d 1542, 1543 (11th Cir. 1990) (per curiam) (holding that the defendant waived its right to arbitrate where it delayed its assertion of the right for 20 months).

*Gen. Star Nat'l Ins. Co.*, 289 F.3d at 438 (alterations and emphasis in *Gen. Star Nat'l Ins. Co.*).

Thus, while there is a strong presumption in favor of enforcing arbitration rights, both this Court and our sister circuits have been willing to find under appropriate circumstances that a party has waived its right to arbitrate by virtue of its actions in delaying the right to the point of prejudicing the other party. *See id.*

### B.  Analysis

Like Astra in *General Star*, Defendant in the matter at hand waived its right to arbitrate due to its actions of engaging in negotiations with Plaintiff for approximately fifteen months (April of 1997 through August of 1998), while at the same time denying the existence of the Agreement and, therefore, the arbitration provision, to the prejudice of Plaintiff. As the record indicates, by way of letter dated April 24, 1997 to Shanahan at AriZona, Plaintiff's former counsel, Eric Smith, informed Shanahan that "[t]he relationship between the parties is subject to an executed Agreement dated September 16, 1995." (J.A. at 189.) The record further indicates that this letter also informed Vultaggio at Hornell and attorney Lawrence I. Fox at MW&E of the Agreement in that Smith's letter was copied to these individuals and received by them. In addition, the record indicates that attorney Lisa S. Derman at MW&E was also aware of the Agreement's existence by way of Smith's April 24, 1997 letter, in that Derman sent a letter to Smith on April 29, 1997, apprising Smith that his letter had been forwarded to her for a "response." (J.A. at 196.)

The record goes on to show that, apparently by way of permission from Derman, Smith and Shanahan engaged in negotiations, Shanahan requested a copy of the Agreement from Smith in a telephone conversation that occurred on May 5, 1997, and Smith sent Shanahan a copy of the agreement on or about May 9, 1997. It also appears from the record that from May of 1997 through July of 1997, negotiations continued between Smith and Shanahan as to the amount of monies owed to Plaintiff apparently under the terms of the Agreement.

The record indicates that the matter was not resolved, Plaintiff obtained new counsel, Gibb, and on December 12, 1997, Gibb sent a letter to Fox at MW&E regarding Defendant's breach of the Agreement and requested that Fox contact Gibb. Having received no response from Fox, Gibb contacted Vultaggio at Hornell by way of letter dated January 9, 1998, regarding Defendant's breach of the Agreement. The record next indicates that on January 15, 1998, Gibb sent a letter to attorney Calandra at MW&E and stated that "[a]ttached is a copy of the Sales Agreement assigning Hornell's Distributor Agreement with [Plaintiff]." (J.A. at 160.) The letter further provides a summary of damages that Plaintiff believes it is due under the terms of the Agreement. Despite Gibb's repeated letters to Calandra during the period of January of 1998 through March of 1998, wherein Gibb in requested that Calandra respond and advise Gibb how Defendant wished to proceed, particularly with respect to the case going to court, Calandra failed to reply.

It was not until April 8, 1998 that Messina, corporate counsel for Hornell, sent a letter to Gibb again denying the existence of the Agreement, and requesting that a copy of the Agreement be sent to her. The record indicates that Gibb complied with the request on that same day, and letters were thereafter exchanged between Messina and Gibb clearly indicating that the two were in the midst of settlement negotiations. For example, in a May 26, 1998 letter to Messina, Gibb stated, "[w]hen we last spoke I understood that

your client, Hornell Brewing, was going to make a preliminary offer of settlement by May 22, 1998. As of the date of this correspondence, I have not received anything to present to my clients. Is the offer forthcoming?" (J.A. at 171.) No settlement was reached, and Gibb indicated in a June 22, 1998 letter to Messina that it appeared that federal court was his "client's only source of relief." (J.A. at 172.)

Finally, after months of communications and negotiations with at least six representatives or attorneys for Defendant, Plaintiff received a letter from yet another attorney at MW&E, James R. Anderson, indicating that Plaintiff's claims as made in its complaint were subject to the mandatory arbitration provision in the Agreement, and that Defendant was "demand[ing] arbitration in New York City of O.J.'s claims and such counterclaims as [Defendant] may choose to interpose." (J.A. at 112-13.) Anderson sent a similar letter to Gibb on August 5, 1998 reiterating that Plaintiff's claims were subject to arbitration. It was not until October 5, 1998, after the entry of default had been made by the clerk of court, that Defendant made a demand for arbitration in New York.

Under these facts, it is clear that Defendant was aware of the Agreement's existence, and in fact had possession of the Agreement by way of Plaintiff's counsel in May of 1997, January of 1998, and April of 1998, and therefore was also aware of the arbitration provision therein. However, Defendant did not maintain that Plaintiff's claims were subject to arbitration until August of 1998, and did not demand arbitration until October of 1998, after the entry of default was made. Thus, as in *General Star*, Defendant slept on its rights for approximately fifteen months (April of 1997 through August of 1998) while Plaintiff incurred costs associated with the matter and was prejudiced as a result. Accordingly, as in *General Star*, we find that Defendant waived its right to arbitrate the matter. *See* 289 F.3d at 438.

While these actions by themselves appear to be sufficient to conclude that Defendant waived its right to arbitrate under

*General Star*, the fact that the arbitration provision contains a 180-day limitation provides a further basis to conclude that Defendant waived its right to arbitrate. That is, for about one year Defendant appeared to engage in negotiations with Plaintiff as if the claims were, as Plaintiff has consistently maintained, not subject to arbitration; then, after suit was filed Defendant prolonged the matter for two more months before claiming that the matter was governed by the Agreement's arbitration provision. However, at this point, Defendant made the claim that the matter was one for arbitration under the Agreement, secure in the knowledge that the 180-day limitation had long expired inasmuch as the alleged breach of which Plaintiff complained occurred in April of 1997. In fact, when Defendant submitted the matter to arbitration, it did so making a preliminary motion to dismiss Plaintiff's claims as time-barred. Under these facts, Plaintiff suffered "actual prejudice" by Defendant's "delaying its assertion" regarding arbitrability, *see General Star*, 289 F.3d at 438, and Defendant should therefore be found to have waived its arbitration rights. *Id.*

In its brief on appeal, Defendant argues that once Plaintiff "formally asserted its claims," Defendant "immediately demanded arbitration, and consistently asserted that [Plaintiff's] claims must be arbitrated." Defendant's Br. at 25. Defendant further argues that "although it had no obligation to do so, [Defendant] commenced the arbitration that [Plaintiff] could have initiated—and in fact was *required* to initiate under the Agreement within 180 days of the occurrence of the events giving rise to its claims." Defendant's Br. at 25. We are not persuaded by Defendant's arguments. The record indicates that Defendant did not "immediately demand arbitration" after Plaintiff filed its complaint in May of 1998, but waited for sixty days before doing so via Defendant's August of 1998 letter to Plaintiff, and waited approximately five months before formally demanding arbitration in New York. Again, Defendant did so after a year or more of claiming that it was unaware of the Agreement's existence—despite Plaintiff's assertions to the

contrary and despite Plaintiff providing Defendant with a copy of the Agreement when requested— and after engaging in talks with Plaintiff, thus providing a basis for Plaintiff to believe that Defendant agreed that the matters were not the type for which arbitration applied.

In short, for more than a year Defendant acted "completely inconsistent with any reliance" upon the arbitration provision, and "delay[ed] its assertion to such an extent that the opposing party [Plaintiff] incur[red] actual prejudice" inasmuch as the 180-day period for resolving matters pursuant to the arbitration provision had long passed. *General Star*, 289 F.3d at 438. The district court found at oral argument that Defendant had not waived its right to arbitrate, noting that Defendant had made Plaintiff aware by way of the August of 1998 letter that the matter was to be arbitrated pursuant to the Agreement. The district court erred in so finding inasmuch as Defendant had denied the Agreement's existence for more than a year and knew by the time that it demanded arbitration that the 180-day limitation had expired.

Because Defendant waived its right to arbitrate, all of Plaintiff's claims should have been decided on the merits before the district court, thus making it unnecessary for us to address Plaintiff's claim that the district court erred in finding that all issues raised in its complaint were subject to arbitration, or to address any of Plaintiff's other claims raised on appeal.[4]

---

[4] During the district court's ruling on the various motions, the court "noted and preserved for the record" that Mr. Ruemenapp, counsel for Defendant, stipulated on the record that he "accept[ed] service on behalf of all the claims involved[.]" (J.A. at 727.) Specifically, the district court inquired of defense counsel, "That is your stipulation, and you accept service on behalf of all the claims involved?" (J.A. at 727.) Defense counsel replied, "That's correct." (J.A. at 727.) The district court concluded, "Okay. So noted and preserved for the record." (J.A. at 727.) Thereafter, in its April 2, 1999, order which, among other things, set aside

## CONCLUSION

For the above-stated reasons, the district court's order confirming the arbitration award is **VACATED**, and the case is **REMANDED** to the district court with instructions that the case should proceed on the merits of Plaintiff's claims.

---

the entry of default and stayed the matter pending arbitration, the district court ordered that "Plaintiff shall serve [sic] have fourteen (14) days from the date of this Order to serve Defendant, and John Ruemenapp stated on the record that he is authorized to accept service of the Summons and Complaint in this case on behalf of Defendant." (J.A. at 203.) Inasmuch as there is nothing in the record to indicate that service of process was not effected in compliance with this order, it would appear that Defendant has been served and that the matter may proceed before the district court on the merits.

---

## CONCURRING IN PART, DISSENTING IN PART

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part. I concur in the majority opinion's holding that the district court did not err in finding that the plaintiff failed properly to effectuate service of process on the defendant, and therefore, the court did not abuse its discretion in setting aside the entry of default. Because I believe that the majority opinion's reliance on *Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434 (6th Cir. 2002), is misplaced, I respectfully dissent from the finding that the defendant waived its right to arbitrate. I believe, contrary to the majority's conclusion, that Hornell's denial of the existence of the Distributor Agreement, although arguably suspicious, was not contrary to its rights under that agreement to arbitrate any properly filed complaint brought by the plaintiff pursuant to that agreement.

*General Star* involved a situation in which, following a lawsuit properly filed by the plaintiff, the defendant waited more than one year from the entry of a default judgment, and almost seventeen months following the commencement of the suit, before finally appearing before the court and moving to vacate the judgment on the basis of a mandatory arbitration clause contained within the agreement between the parties. *Gen. Star*, 289 F.3d at 438 (emphasizing the amount of time between the filing of the complaint and the demand for arbitration, and finding that "a party may waive the right by delaying its assertion to such an extent that the opposing party incurs actual prejudice.")[1]  In *General Star*, the defendant's

---

[1] The court in *General Star* relied upon two cases in which the defendants who waited more than a year following the filing of complaint to assert their rights to arbitrate were found to have waived any right to arbitrate the claim. *See Gen. Star*, 289 F.3d at 438 (citing *Menorah Ins.*

actions were inconsistent with the right to arbitrate because the defendant allowed a complaint to sit for a year and a half while the plaintiff incurred the costs of maintaining the litigation. Hornell's actions in the current case—denying the existence of the agreement prior to O.J. Distributing's filing the complaint and demanding arbitration relatively quickly after the filing of the complaint—are clearly distinguishable from the actions of the defendant in *General Star*. Furthermore, the only prejudice suffered by the plaintiff arose from its failure to timely file the complaint and not from any delay by the defendant in seeking arbitration once the complaint was filed.

The terms of the Distributor Agreement required the plaintiff to "formally" assert its claim "no later than 180 days following the event or circumstances giving rise to the underlying claim . . . ." Although the defendant's denial of the existence of the agreement delayed the plaintiff's attempts to negotiate a settlement of the underlying claim, that denial did not prevent O.J. Distributing from "formally" asserting its claim with a properly filed complaint. The plaintiff has never asserted that *it* was unaware of either the existence of the Distributor Agreement or the requirement that it formally bring its claim within 180 days of the act giving rise to the complaint. None of the actions of Hornell cited by the majority opinion prevented O.J. Distributing from timely filing the complaint. A party's denial of the existence of an agreement giving rise to a cause of action does not foreclose a complaining party's ability to formally bring its charge within the time period specified in the agreement. The impact of Hornell's denial of the contract is completely separate from the question of whether the plaintiff suffered prejudice from the timing of the demand for arbitration *once the complaint was filed*. No action or dely by Hornell caused the plaintiff to file its complaint after the 180-day deadline had already

*Co. v. INX Reinsurance Corp.*, 72 F.3d 218 (1st Cir. 1995), and *Stone v. E.F. Hutton & Co.*, 898 F.2d 1542 (11th. Cir. 1990)).

expired.[2] Unlike the facts in *General Star*, there was no one-year or greater delay by the defendant in demanding arbitration that prejudiced that plaintiff in the present case.

*General Star* does not stand for the proposition that a party to an agreement containing a mandatory arbitration clause must demand arbitration once it is notified that another party *might* bring suit to enforce rights allegedly violated under the agreement. This is not a case where the plaintiff filed suit within the deadline and the defendant "participated in the litigation" beyond the specified deadline and then moved to dismiss based on a mandatory arbitration clause, or, as in *General Star*, failed to appear for over a year, forcing the plaintiff to incur costs and delay while attempting to vindicate their rights in court. The obligation on the part of the defendant to demand arbitration arises once the defendant is faced with a properly filed claim. Only where a plaintiff properly files a complaint against the defendant and the defendant subsequently extends the litigation or delays asserting its arbitration rights does the question of prejudice to the plaintiff raise the possibility that the defendant waived

[2]The possibility that Hornell acted in bad faith when it denied the existence of the contract is not relevant to the question of whether or not it acted inconsistently with its right to arbitrate any formally filed claim. The only time pertinent to the issue raised by *General Star* is the time after O.J. Distributing filed the complaint. Accordingly, I disagree with the majority opinion's assertion that the defendant "slept on its rights for approximately fifteen months (April of 1997 through August of 1998) while Plaintiff incurred costs associated with the matter and was prejudiced as a result." Supra majority at 24. Specifically, we hold above that the district court did not err in finding that the plaintiff failed to properly effectuate service of process on the defendant. Supra majority at 18. Therefore, the defendant demanded arbitration before the court gained personal jurisdiction over Hornell, *e.g., Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987), which is completely contrary to the facts of *General Star*. Moreover, the only costs relevant to the analysis under *General Star* are the costs associated "with the action," *Gen. Star*, 289 F.3d at 438, which is usually considered an actual judicial proceeding, not the communications between the parties prior to the lawsuit. *See* BLACK'S LAW DICTIONARY 28-29 (Deluxe 7th ed. 1999).

the right to arbitrate—this case presents neither of these scenarios.   Accordingly, on the issue of the waiver, I respectfully dissent.   I would therefore affirm the district court's decision in its entirety.